

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

SSA/APW
F. #2021R00830

*610 Federal Plaza*
*Central Islip, New York 11722*

November 10, 2024

By ECF and Email

The Honorable Gary R. Brown
United States District Judge
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

    Re:  United States v. Naresh Deonarrain
        Criminal No. 21-451 (S-3) (GRB)

Dear Judge Brown:

  The government respectfully submits this letter in advance of the defendant Naresh Deonarrain's sentencing, which is currently scheduled for November 15, 2024. The defendant's United States Sentencing Guidelines range of imprisonment is 211 to 248 months.[1] For the following reasons, the government recommends that the Court impose a sentence with the range contemplated by the parties' plea agreement without the third acceptance point, which is also 211 to 248 months. This is a deviation from the parties' agreement to jointly recommend a sentence of 156 months. As set forth below, the defendant committed additional criminal acts while incarcerated, after executing the plea agreement, thereby violating its terms, and justifying the government's increased sentencing recommendation.

  I.  The Route Boys

  Beginning in early 2021, numerous law enforcement agencies joined together to investigate a group known as the "Route Boys." (See United States Probation Department ("Probation"), Presentence Investigation Report ("PSR") at ¶¶ 6-7). The Route Boys initially came to law enforcement's attention in late 2020 when members of the group began burglarizing commercial establishments—bodegas, check cashing businesses, laundromats—and stealing cash, tobacco products and ATMs. (PSR ¶ 6). They then moved on to targeting small "mom and pop" pharmacies in the five boroughs; Long Island; Westchester and Rockland Counties; and eventually New Jersey and Connecticut. (PSR ¶ 7). Throughout this crime wave, their *modus operandi* remained consistent: three to four participants would travel to multiple locations in quick

---

[1] See Presentence Investigation Report (PSR) ¶ 152.

succession on a given night; often in a stolen car, with stolen plates that were routinely switched to avoid detection; break in forcefully, either by smashing glass with crowbars, rocks, or grinders; and quickly grab their proceeds. Law enforcement officers have reviewed hundreds of hours of surveillance video from the burglaries. Video shows that once inside, the perpetrators know exactly what they are looking for on the shelves, immediately grabbing oxycodone, Xanax, and Promethazine/Codeine cough syrup. The group was usually in and out of the targeted pharmacy in a few minutes and then on to the next hit.

The government amassed extensive evidence tying the Route Boys to the burglaries, including but not limited to video surveillance, cell-site location data, social media posts, photos and messages obtained from the defendants' phones, license plate reader ("LPR") data, and witness statements. The government's conservative estimate is that the Route Boys committed at least 100 burglaries in the Tri-State Area between approximately November 2020 the summer of 2022. (PSR ¶ 10).

In addition to committing dozens of burglaries, the Route Boys also sold massive quantities of drugs. Indeed, the name "Route Boys" refers to members having their own drug "route." The Route Boys sold the controlled substances they stole by advertising on social media. (PSR ¶ 6). In addition to selling the pharmaceutical burglary proceeds, many Route Boys sold illegal drugs such as cocaine, marijuana, ecstasy and fentanyl. (PSR ¶¶ 2, 38, 41).

Furthermore, the Route Boys routinely possessed firearms to assist themselves in trafficking drugs and threatening rivals. (PSR ¶ 6). Many Route Boys have been arrested and found with drugs and guns. (PSR ¶¶ 20-21, 28, 29, 40-41, 56, 61-65, 69). They also posted countless images and videos of themselves on social media with guns.

Finally, and perhaps most dangerously, after members of Route Boys committed a crime, they fled in high-end vehicles at an extremely high rate of speed, often crashing into other cars and endangering the lives of law enforcement officers and innocent citizens. (PSR ¶ 7). Indeed, fleeing from the police in luxury stolen cars was something that members routinely bragged about. Tragically, these instances of high-speed flight resulted in two known fatalities (PSR ¶¶ 29, 61) and dozens of injuries to innocent civilians, law enforcement officers and other members of the Route Boys.

In short, the scope of the Route Boys' crimes and the impact they had on the Eastern District of New York, and elsewhere, was enormous. They knowingly terrorized neighborhoods over a two-year spree, endangering fellow citizens and wreaking havoc wherever they went.

II.     Naresh Deonarrain's Role in the Route Boys

Naresh Deonarrain is a prominent member of the Route Boys who began committing crimes early on in the conspiracy. He, like many of his co-defendants, used social media to advertise both stolen drugs and his firearms possession.

The government's investigation has placed Deonarrain personally at numerous burglaries. In December 2020, using a Dodge Ram he had stolen, he burglarized a Brooklyn business and stole an ATM with approximately $30,000 in cash. Two days later, on December 9,

2020, at about 3:00 a.m., the defendant, along with co-defendants Alberto Santiago[2] and Jose Rosado, used the same stolen Dodge Ram in an attempt to burglarize another Brooklyn small business. NYPD responded to the location, and the Route Boys led them on a chase. NYPD was unsuccessful, and less than an hour later, the defendant and his cohorts burglarized another small business, leaving with an ATM. At 5:25, they hit another location. Unable to grab the ATM, they walked off with cash from the register instead. An hour later, they burglarized a small pharmacy, making off with, among other substances, hundreds of oxycodone pills. This particular night, like many others, the Route Boys came prepared to grab and go: armed with a Sawzall, so they could quickly break into the businesses. The next morning, they all posted images on Instagram advertising the stolen pharmaceuticals for sale.

In the span of approximately two hours on April 20, 2021, the defendant, along with co-defendants Cavier Nedrick and Eric Nunez, broke into three Long Island pharmacies, with other Route Boys. They used the same stolen grey Audi to travel to each burglary. At 3:20 a.m., they smashed the door of Carman Drugs in Carle Place and stole oxycodone, promethazine, and Xanax. Seventeen minutes later, at 3:37 a.m., they broke the window at Konfetti Pharmacy in Westbury, entered, but left without taking anything. At 4:40 a.m., they broke into a pharmacy in Valley Stream (see PSR ¶¶ 43-47). They grey Audi was later recovered where they abandoned it in Brooklyn, and it contained pharmaceuticals from Carman Drugs.

In the early morning hours of May 31, 2021, the defendant, working with others, including Nedrick, stole a white Lexus in Queens, and used it to commit five pharmacy burglaries on Long Island—two in Nassau, three in Suffolk. At 3:02 a.m., they hit a pharmacy in Merrick and stole controlled substances. At 3:59 a.m., they broke into Unity Pharmacy in East Islip. At 4:46, they burglarized RX Express in Commack. At 4:57, they attempted to enter Vanco Pharmacy in Commack. And finally, they broke into Cottage Pharmacy in Woodbury (see PSR ¶¶ 49-52).[3]

On June 29, 2022, the day of the federal takedown, the defendant's Route Boys run ended when he was arrested at an apartment in Ozone Park with co-defendant Carlos Acevedo. The apartment was full of pharmaceutical drugs: hundreds of oxycodone, hydromorphone, and Xanax pills; along with marijuana, scales, plastic baggies, and approximately $5,500 in cash.

### III. The Defendant's Criminal History and Jail Record

#### A. Criminal History

The defendant has been committing crimes since he was 16 years old, when he was convicted of felony robbery in Brooklyn (PSR ¶ 109). He received a nine-month incarceratory sentence, unusual for a first-time youthful offense. In 2017, at age 20, he was convicted of

---

[2] Communications between Santiago and co-defendant Jason Liriano shortly before these burglaries show that Santiago indicated he was "getting dark," which the investigation has revealed is code for committing burglaries.

[3] In many of the above-described burglaries, Deonarrain is wearing the same distinct pair of purple and black sneakers, which were recovered from him at the time of his federal arrest.

misdemeanor reckless driving in Queens (PSR ¶ 110). There, he sped down Atlantic Avenue, blew through four red lights, causing other cars to slam on their brakes to avoid collision. When officers stopped him, they discovered he had no license—only a learner's permit.

Also in 2017, after lying about his name while the passenger in a traffic stop on the New Jersey Turnpike, he was arrested for hindering prosecution and giving false information, misdemeanors, in New Jersey (PSR ¶ 114). There is a pending bench warrant on that case.

On July 15, 2017, NYPD responded to a location in Brooklyn in response to a 311 noise complaint. When the defendant observed them, he threw away a lit marijuana cigarette and fled on foot. He ultimately stated that he ran because he had marijuana and was on probation. He provided false identifying information. Once he was placed in the police car, he began kicking the windows, attempting to break them. The case was ultimately adjourned in contemplation of dismissal (PSR ¶ 115).

Most notably, on February 12, 2022, NYPD officers responded to a report of multiple individuals fighting and brandishing firearms at a hotel in Brooklyn. When officers arrived, they saw the defendant flee the location in a Lexus. They attempted to stop him, and he fled, leading them on a high speed chase. He crashed into a marked police car, blew out a tire, and kept driving recklessly. He crashed again—into a fence—and kept fleeing still. He drove on to the Van Wyck Expressway, crashed into another marked police car, and injured two officers. Finally, he crashed into a barrier and the Lexus stopped. When officers arrested him, they discovered that the Lexus and its license plate were both stolen. In the trunk, they recovered a gun with ammunition, a scale, and a large quantity of illegal drugs: 1,642 methamphetamine pills; 49 oxycodone pills; 73 oxycodone/hydrocodone pills; 70 Endocet pills; 100 Xanax pills; 94 Kruvelo pills; and over three kilograms of marijuana packaged in 40 bags (PSR ¶ 64).[4] Despite all this, the defendant was released on bail, and continued his crime spree with the Route Boys.

---

[4] This incident is charged in Count Sixteen of the Indictment.



On February 23, 2022, while out on bail on the above arrest, the defendant, along with co-defendant Eric Nunez, physically assaulted a couple who had attempted to pass Nunez's moped. While the defendant fought with the male, Nunez pulled the male's girlfriend out of the car and punched her in the face. They fled but were ultimately apprehended and arrested. Again, he was let out on bail, and his crimes continued, unabated (PSR ¶ 67).



B. MDC Records

Since being incarcerated at the MDC, the defendant has amassed multiple disciplinary infractions—some incredibly serious (PSR ¶ 124). On May 2, 2024, MDC staff observed him physically fighting with another inmate, Devante Carpenter. Later, after that initial fight, video surveillance showed the defendant, his co-defendant Cavier Nedrick,[5] and another

---

[5] As the Court is aware, the government did not seek for it to consider this assault as to Cavier Nedrick during his sentencing. The government submits that there is significantly more proof against this defendant for the incident, including the physical fight with Carpenter before the

inmate following Carpenter into a cell. When the Carpenter exited the cell on video, his face was covered in a towel and blood. The victim suffered multiple stab wounds on his face and back, requiring 911 response and transport to an outside hospital. After the stabbing, Deonarrain had injuries on his hands, consistent with holding an object used for the stabbing. Carpenter and Deonarrain's injuries appear below:



On an earlier date, in March 2023, MDC employees attempted to do a pat down search of the defendant. He took off running and threw a package to the ground. The package ultimately contained approximately 100 contraband cigarettes. Once the defendant was apprehended, he became physically combative with the guards, punching and kicking them. Further search revealed he had 18 Oxycodone pills and a homemade weapon (a sharpened piece of plexiglass) in his clothing.

---

stabbing, observed by MDC employees, and the injuries to the defendant's hands, consistent with committing the act.



On February 14, 2024, he had two homemade weapons in his cell: 7-inch sharpened metal objects with cloth handles. During this search, MDC guards also found 15 grams of marijuana on the defendant.

Additionally, on January 5, 2023, he had a cell phone charger in his cell and had destroyed a light fixture in order to use the charger. On April 17, 2024, he actually had a cell phone in his cell.[6]

IV.    The Sentencing Guidelines and Plea Agreement

The guidelines applicable to the defendant are set forth in the PSR. As to Count One:

| | | |
|---|---|---:|
| Base Offense Level (U.S.S.G. § 2D1.1(c)(4)) | | 32 |
| Plus: | Distributed drugs using social media (§ 2D1.1(b)(7)) | +2 |
| Plus: | Reckless endangerment during flight (§ 3C1.2) | +2 |
| Less: | Acceptance of Responsibility (§ 3E1.1(a)) | <u>-3</u> |
| Total: | | <u>33</u> |

Based upon a total offense level of 33 and criminal history category II, the PSR indicates a range of 151 to 188 months on Count One. The PSR's ultimate guideline calculation for the defendant is 211 to 248 months, taking into account the consecutive 60-month term for Count Seventeen (PSR ¶ 152).

The government calculated the same initial offense level in the plea agreement, and the defendant stipulated to the calculation. In the plea agreement, the government also

---

[6] The defendant pled guilty on August 15, 2023. Thus, many of these MDC infractions—including the most serious, the Carpenter assault—occurred after his plea.

contemplated the defendant would receive all three acceptance points and a further one-point reduction for a global disposition, for a final offense level of 32. At a criminal history category II, this led to a guidelines range of 195 to 228 months on Count One,[7] with a mandatory consecutive term of 60 months on Count Seventeen, for a total range of 195 to 228 months. In the plea agreement, the parties jointly agreed to recommend a sentence of 13 years, or 156 months.

Without the third acceptance point (but still taking into account two acceptance points and the global point), the defendant's offense level is 33, with criminal history category II, leading to a range of 151 to 188 months on Count One, and corresponding total range of 211 to 248 months with the mandatory consecutive sixty-month term for Count Seventeen.[8]

The government submits that because the defendant committed additional criminal acts after he pled guilty, he is not entitled to the one-level reduction for acceptance of responsibility. See United States v. Rodriguez, 978 F.2d 65, 67 (2d Cir. 1991); United States v. Wimble, 387 Fed. Appx. 63, 64 (2d Cir. 1991)(affirming district court's denial of acceptance of responsibility reduction where defendant "was involved in multiple crimes subsequent to his guilty plea"); United States v. Woods, 927 F.2D. 735, 736 (2d Cir. 1991)(affirming district court's denial of acceptance of responsibility reduction and explaining that "continued involvement in criminal activity casts substantial doubt on the sincerity of a defendant's protestations of contrition, and a court is well within its discretion in considering such involvement in setting a defendant's sentence.").

The government asks that the Court impose a sentence within the 211 to 248 month Guidelines range.

V. Argument

With the advisory Guidelines as the starting point and initial benchmark, the Court should consider the factors set forth by Congress in § 3553(a). The statute provides that a Court should consider a number of factors when determining a defendant's sentence, including:

---

[7] As to Count One, the defendant pled guilty to conspiracy to distribute controlled substances under 21 U.S.C. § 841(b)(1)(C), which carries no mandatory minimum sentence. Accordingly, his effective mandatory minimum is five years on Count Seventeen (use of firearms in furtherance of drug trafficking under 18 U.S.C. § 924(c)(1)(A)(i)).

[8] The signed plea agreement included the following provision: "If information relevant to sentencing, as determined by the Office, becomes known to the Office after the date of this agreement, the Office will not be bound by paragraph 5(b). Should it be judged by the Office that the defendant has violated any provision of this agreement, the defendant will not be released from his plea of guilty but this Office will be released from its obligations under this agreement, including but not limited to: (a) *moving for the additional one-level downward adjustment for timely acceptance of responsibility* described in paragraph 2 above; and the (b) provisions of paragraphs 5(a)-(b)."

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and
>
> (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

Here, the nature and circumstances of the offense require a substantial sentence. The defendant was part of a massive criminal conspiracy that menaced the entire Tri-State area for an extended period. The defendant was not someone who made a one-time mistake; rather, he and his cohorts consistently committed crimes as a way of life. Everyone in the neighborhood knew of the Route Boys. A guidelines sentence will promote respect for the law and afford adequate deterrence. Deterrence has two components: general and specific. Both are necessary here. Nedrick, like nearly all of his co-defendants, has engaged in a steady stream of criminal activity throughout his young life, with no serious criminal justice consequences. The time is now.[9]

Deonarrain is not a defendant who accidentally tagged along for one or two burglaries and took pharmaceuticals for personal use. He was a leading participant. As the PSR reflects, on some nights, he hit as many as five pharmacies in a span of mere hours—speeding from small business to small business, in stolen cars, to pillage controlled substances and sell them for profit. These crimes had enormous impact on the surrounding community, in several ways: the economic loss for small local businesses; the danger of reckless driving to everyday citizens on our roads; and the flooding of the streets with illegal substances.

Deonarrain's arrest vividly illustrates just what a serious participant he was. That day, he was found in an apartment with another Route Boy, along with hundreds of stolen pharmaceutical pills.

Deonarrain's behavior since incarceration also weighs in favor of a guidelines sentence, higher than the parties' initial joint recommendation. The defendant is a significant contributor to the current conditions at the MDC. The government expects that the defendant, like many other MDC inmates, will use those conditions as a reason for this Court to impose a lesser sentence. But he cannot simultaneously contribute to the lawless, violent conditions at the MDC and claim them as a reason he should be granted leniency.

Finally, Section 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." The Court has sentenced several of Deonarrain's fellow Route Boys already: Jeffrey Vargas received 156 months, Eric Nunez received 144 months, Ramon Collado

---

[9] Anecdotally, the government is aware, through witness statements and social media investigation, that the federal takedown in June 2022 sent reverberations through the Route Boys' neighborhood, and that community peers—criminal or otherwise—were sobered by the arrests.

received 132 months, Carlos Acevedo received 126 months, and Cavier Nedrick received 120 months.

The government believes that its requested sentence adequately reflects Deonarrain's relative role in the Route Boys conspiracy, takes into account his charged criminal conduct, and recognizes his egregious post-plea behavior while incarcerated.

IV. Conclusion

For these reasons, the government respectfully submits that a Guidelines sentence of 211 to 248 months is appropriate in this case.

Respectfully submitted

BREON PEACE
United States Attorney

By: *Samantha Alessi*
Samantha Alessi
Andrew P. Wenzel
Assistant U.S. Attorneys
(631) 715-7894/7832


cc: Joseph Kilada, Esq. (by ECF)
Clerk of the Court (GRB) (by ECF)
U.S.P.O. Lisa Langone (by email)